**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANNEMARIE "ANNIE" DAMICO** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 25-2408** |
| | : | |
| **VARIETY THE CHILDRENS CHARITY** | : | |
| **OF THE DELAWARE VALLEY** | : | |

**McHUGH, J.**                                                                          **APRIL 27, 2026**

**MEMORANDUM**

This is an action alleging unlawful discrimination based on disability. Plaintiff was hired as an administrative assistant with bookkeeping responsibilities by a children's charity. During her eight months there, she made passing references to diagnoses of post-traumatic stress disorder (PTSD) and attention deficit hyperactivity disorder (ADHD) but declined her employer's invitation to provide more specific details or formally request accommodations. The only requests she did make—permission to wear earbuds while working and for time off—were not specifically linked by her to her disabilities and were granted. Meanwhile, issues arose: she struggled with her job's core tasks, petty cash was unaccounted for, and some employees were overpaid, including Plaintiff herself. She was terminated and now claims under state and federal law that she was discriminated against because of her disabilities, and suffered retaliation for having engaged in protected activity.

With discovery complete, her employer seeks summary judgment. Because Plaintiff fails to point to evidence that would reasonably support her claims, I am obligated to grant the pending motion.

## I.       Factual Record

Defendant Variety is a Pennsylvania charity that provides services to children with physical and intellectual disabilities, including through holiday fundraisers and a summer camp. *See* Bernardo Dep. 13:25-14:4, ECF 15-5; Pl. Dep. 23:1-3, ECF 15-4; DeGori Dep. 27:10-14, ECF 15-7. About twenty people work at Variety under CEO Dominique Bernardo. *See* Variety Organizational Chart, ECF 15-6. Administration is streamlined. Under Bernardo, Accounting and Human Resources Manager Lisa DeGori directs the charity's finances. *Id.* Under DeGori is one full-time administrative employee who serves both bookkeeping and human resources roles. *Id.* That employee's duties include reviewing employees' time sheets and entering them into payroll software, as well as keeping track of loose "petty cash" that the organization makes and spends at its events. *See* Job Description, ECF 15-10.

In November 2022, Variety hired Plaintiff Annie Mosakowski (née Damico) for this role.[1] *See* Pl. Dep. 19:24-20:24. Her application showed that she had a bachelor's degree, as required by the listing, and experience in administrative assistance, albeit not as a bookkeeper. *See generally* Pl.'s Application, ECF 15-9. She also disclosed that she had been fired from a previous job after the cash drawer under her care was short $10. *Id.* at 4.

In early January 2023, after Variety's holiday event, DeGori found that the organization's petty cash was short $1,500. *See* DeGori Dep. 27:10-21. The money had been counted off, placed in envelopes, sealed with rubber bands, and then locked in a drawer of Plaintiff's desk. *Id.* 27:20-

---

[1] Given that Mrs. Mosakowski changed her name from Damico during the course of this lawsuit, this opinion will refer to her as "Plaintiff" solely to avoid any confusion.

28:14.  Although Plaintiff was responsible for handling the money and had the only key to the drawer,  no one at Variety ever determined what happened to the money.  *Id.* 34:6-12. Plaintiff does not contest this testimony.

Later in January, Plaintiff asked DeGori whether she could listen to music through earbuds while she worked.  *See* Pl.'s Dep. 30:23-31:1.  DeGori checked with Bernardo and then gave Plaintiff permission.[2]  *Id.* 31:6-8.  In making this request, Plaintiff mentioned needing the earbuds for "concentration and focus."  *Id.* 32:20. She admits, however, that she did not specifically mention that she had been recently diagnosed with post-traumatic stress disorder (PTSD), and counts among her symptoms issues with sleep and focus at work.  *See id.* 16:18-20.  For purposes of this case, she now contends that seeking permission to wear earbuds should be considered an informal request for a reasonable accommodation under the ADA,  *see* Pl.'s Br. at 2, ECF 17-1,[3] despite her failure to link it to any disability at the time, *see* Pl.'s Dep.at 32:17-25.

Plaintiff's discussion of her disabilities remained informal throughout her employment. Sometime after the earbud request, Plaintiff testified that she advised DeGori of an ADHD

---

[2] There is some difference in the backstory to Plaintiff's request to wear earbuds, which becomes relevant to the later discussion of disability discrimination.  Plaintiff says that Variety's CEO, Dominique Bernardo, grew tired of employees playing and listening to music while they worked, and ordered all employees to stop, at which point Plaintiff asked for an accommodation.  *See* Pl. Dep. 31:1-11.  Bernardo does not remember ever feeling or saying any of that, nor does DeGori remember such a policy.  *See* Bernardo Dep. 36:22-37:12; DeGori Dep. 46:5-22.  As DeGori recalls it, Plaintiff was playing music out loud while she worked, and when DeGori asked Plaintiff to turn it off, Plaintiff counteroffered to play music through her earbuds, which DeGori accepted.  *See* DeGori Dep. 46:11-15 ("Once [the previous HR assistant] finished up, and Annie was on her own, she asked if she could play music. I find it very distracting. And she said, 'I can wear headphones,' and pulled them out of her bag. I said, 'That'll work.'").  The relevant point is that there was no testimony linking earbuds to a diagnosis of PTSD.

[3] At her deposition, Plaintiff initially said that the headphones were a reasonable accommodation for her ADHD, despite saying in the previous sentence that she had not yet been diagnosed with ADHD.  *See* Pl. Dep. 30:16-25; 32:17-2.

diagnosis she had just received.  *See* Pl. Dep. 30:16-20.  Bernardo testified she cannot recall learning of any disabilities.  Bernardo Dep. 55:21-22; 63:15-23.  DeGori does not recall hearing about an ADHD diagnosis but admits she learned about the PTSD diagnosis after another employee complained that Plaintiff may have been high at work, leading Plaintiff to explain that she had a medical marijuana card to treat her PTSD.  *See* DeGori Dep. 23:17-24:8; 45:22-24.[4] After learning about Plaintiff's PTSD, DeGori testified that she invited Plaintiff to fill out an ADA accommodation form to document her diagnosis and needs.  *See* DeGori Dep. 21:22-23:5. This form allowed employees to explain their disabilities and give Variety notice about how those disabilities affect their ability to work, and thus what reasonable accommodations the employee would like.  *See* Variety Employee Handbook at 6, ECF 15-8; *see generally* Variety's ADA Questionnaire, ECF 15-12.  Plaintiff never filled out a form, leaving her scattered verbal comments as the only potential notice she gave.  *See* Pl. Dep. 28:10-14.

As 2023 went on, DeGori found issues large and small with Plaintiff's work performance. After the petty cash went missing in January, DeGori set up a new counting and tracking system for the money.  *See* DeGori Dep. 36:23-37:3.  But again in June, the cash drawer came up $60 short.  *Id.* 39:20-40:7.  When Plaintiff responded that she got "interrupted sometimes counting or loses count when she's counting the bills," DeGori created a programmed spreadsheet so that all Plaintiff needed to do was count the number of each denomination of bills in the pile.  *Id.* 40:2-25. In an April text message to DeGori, Plaintiff confessed that the sight of complex spreadsheets

---

[4] Plaintiff admits to smoking marijuana three to five times per week during her employment at Variety, but maintains she never smoked "during the workday."  *See* Pl. Dep. 17:15-19:18. Nothing in the record suggests that this was a consideration in Plaintiff's firing.

overwhelmed her and made her mind "shut down," saying "maybe I . . . really do have ADHD," to which DeGori responded with encouragement.  *See* Text Messages, ECF 15-17.

Then, in July, Plaintiff's mother was the victim of a violent carjacking.  *See* Pl. Dep. 34:6-8.  Plaintiff struggled with the stress she felt afterward and ultimately took two days off from work to take a personal trip to Salem, Massachusetts.  *See id.* 37:2-14, 39:5-7.   Privately, Plaintiff believed she needed up to three weeks off to cope with the stress, but she felt afraid to ask for more because she had gotten the impression DeGori did not want her to miss work during Variety's busy summer camp season.  *Id.* 35:4-23; 38:1-19.  DeGori denies making this statement.  *See* DeGori Dep. 47:3-17. Regardless, Plaintiff concedes that neither DeGori nor anyone else said anything negative before or after her two days off.  *See* Pl. Dep. 35:4-9; 38:4-7.  In August Plaintiff's dog fell ill; Plaintiff took half a day off for a veterinarian appointment and a full day to grieve when the dog died.  *See id.* 40:7-13.  She did not request any further time off, though she harbored a belief that four to five days off would have been more appropriate.  *See id.* 40:1-43:3. Once again, Plaintiff suffered no criticism for taking time off.  *Id.* 43:5-7.

Meanwhile in early August of 2023, a Variety employee approached DeGori and reported that he had been overpaid in April.  *See* DeGori Dep. 53:1-53:11.  The employee said that he had told Plaintiff, yet Plaintiff had never told DeGori about the error.  *See id.*  DeGori reviewed months of timesheets and payrolls and found multiple entries in which Plaintiff had entered hours as both vacation time and paid time off, resulting in overpayments.  *See id.* 54:22-56:17.  This included Plaintiff herself.  *See id.*; *see also* Pl.'s Payroll Records, ECF 15-13 (showing Plaintiff's time off duplicated as PTO and vacation time).  Plaintiff concedes the errors but maintains these double entries were unintentional, she had "no idea" she had done the duplication, and that any errors in the payrolls were not her "ultimate responsibility."  *See, e.g.*, Pl. Dep. 53:23-54:15.

By this point, DeGori says she was not "comfortable leaving [Plaintiff] alone knowing she knew about the overpayments and never reported them, including those to herself." DeGori Dep. 67:23-68:16. Because DeGori felt her job was to "protect . . . the finances of the organization," she "could no longer trust" Plaintiff, and recommended her termination to Variety's CEO, Bernardo. *Id.* Bernardo agreed based on she and DeGori's "fiduciary responsibility . . . to ensure that we are properly securing the assets of the corporation." Bernardo Dep. 38:5-38:18.

Late in August, Variety fired Plaintiff. *See* Pl. Dep. 54:25-55:4. This action followed.

## II.   Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.   Discussion

Summary judgment is warranted because Plaintiff has pointed to no evidence that could lead a reasonable jury to conclude that Variety discriminated against or retaliated against her because of her disabilities.

The discrimination claims and the retaliation claims are both governed judged by the three-step *McDonnell Douglas* burden-shifting framework. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).[5] First, the employee must make a *prima facie* case of discrimination. *See*

---

[5] The analysis under the ADA and the PHRA is the same. *Colwell v. Rite Aid*, 602 F.3d 495, 499 n.3 (3d Cir. 2010) (noting that disability discrimination claims are analyzed the same under the PHRA and ADA); *Rinehimer v. Cemcolift*, 292 F.3d 375, 382 (3d Cir. 2002) (noting that retaliation claims are also analyzed the same under the PHRA and ADA).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The burden of production then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's [termination]."  *Id.*  If an employer meets this burden, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  Within this burden-shifting framework, disability discrimination and retaliation claims have slightly different elements.

### A.  The record does not support a claim for disability discrimination.

Plaintiff first claims Variety violated her rights under the ADA and PHRA by discriminating against her on the basis of her disability when they fired her.  Compl. ¶¶ 54-76, ECF 1.

To make a *prima facie* case of disability discrimination, Plaintiff must show "(1) that [s]he is disabled within the meaning of the ADA, (2) that [s]he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that [s]he was subjected to an adverse employment decision as a result of the discrimination."  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).  The parties do not dispute Plaintiff's disabilities.

As to the second *prima facie* element, a reasonable jury could find that she was qualified for the position. Variety argues that Plaintiff's struggles in the job and her relative lack of bookkeeping experience made her unqualified. The question of qualification involves two components, whether the employee has "the prerequisites for the position" and whether the employee is "able to perform the essential functions of the position held or desired, with or without reasonable accommodation." *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 415 (3d Cir. 2017) (internal quotations omitted). Variety cannot establish that Plaintiff lacked the prerequisites, particularly when it hired her knowing that she lacked a background in bookkeeping.  *Compare* Job Description, ECF 15-10 (requiring a bachelor's degree and preferring experience in bookkeeping), *with* Damico Job

Application, ECF 15-9 (showing a bachelor's degree and experience in administrative assistance). Variety's argument that she was not able to perform the job has greater force, particularly because Plaintiff has not explained what accommodations could have been provided that would have overcome her admitted inability to process spreadsheets or keep track of petty cash.

But even if one assumes such an accommodation could be provided, there is no creditable evidence that Variety fired her *because of* her disabilities. An ADA plaintiff must "prove that [her] disability was a determinative factor in the Company's decision to terminate [her]." *Kairys v. S. Pines Trucking*, 75 F.4th 153, 161 (3d Cir. 2023) (internal citation omitted). Relevant proof may be direct or indirect. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).

Here, Plaintiff points to no direct evidence. Her argument based on indirect evidence is that she was fired soon after taking a few days off during Variety's busy season, time she needed because her mother's carjacking and her dog's death aggravated her PTSD and ADHD symptoms. *See* Pl.'s Resp. at 9. She contends that the chronology of events "suggests a causal connection between her protected activity related to her disability and her termination." *Id.* at 9. Temporal proximity usually has more relevance in the context of retaliation claims. *See, e.g.*, *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (holding an "unusually suggestive" temporal proximity between an employee engaging in a protected activity and termination can support a finding of retaliation). But assuming that the doctrine applies here, Plaintiff lacks sufficient evidence that her requests for days off were protected activity.

Seeking time off because of one's disabilities can certainly represent a protected activity under the ADA, which defines unlawful discrimination by an employer as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . ." 42 U.S.C. § 12112(b)(5)(A). But here there is not enough evidence that

DeGori and Bernardo knew the requests for time off were in any way related to the disabilities Plaintiff had informally mentioned over the course of months.  To start, Plaintiff's deposition suggests that she herself never actually connected the stress of her personal struggles with her PTSD or ADHD. Although Plaintiff's brief argues that the events worsened her disability symptoms, the deposition testimony it cites simply does not support that position.  *See* Pl.'s Resp. at 3.  Plaintiff's case is stronger as to the two discrete events, her mother's trauma and her dog's death, but as discussed above, Plaintiff never linked her request to any disability when seeking time off.

"[T]o establish discrimination because of a disability, an employer must know of the disability." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002).  And with respect to requests for accommodations, the employee must "make clear that the employee wants assistance for his or her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations *for that disability.*"  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (emphasis added);  *see also Shafnisky v. Bell Atl.*, No. 01-3044, 2002 WL 31513551, at *7 (E.D. Pa. Nov. 5, 2002) ("While a request for accommodation need not be formal, the employee must make clear that she is seeking assistance for a disability.")

Here, the record contains no evidence Variety knew that Plaintiff's time-off requests were requests for reasonable accommodations for disability.  Plaintiff never submitted Variety's formal ADA accommodation request form despite Variety calling it to her attention. In each instance her requests for time off were approved, and in no instance was she criticized for the time she took. Plaintiff maintains that she did not ask for more time off because she was "afraid to" based on DeGori's alleged comments about not taking off during Variety's busy season. As a general matter, an employer is certainly entitled to ask employees to minimize time off during peak operating

times, whether it be an accounting firm during tax season or a charity like Variety sponsoring children's programs during the summer months.  The ADA is not implicated unless the employer invokes such a policy in response to a request for an accommodation, or specifically to discourage requests, which did not happen here. The requests for time off in July and August were in response to life events that would have been upsetting to anyone, not just someone coping with a disability. Having granted Plaintiff all the time off she requested, Variety can hardly be found to have discriminated against her for failing to intuit that she might have needed more, based solely on passing references to her PTSD and ADHD.  And the notion that Plaintiff's August firing was a result of her January request to wear headphones at work is fanciful.

Plaintiff's discrimination claim also fails because Variety offers compelling reasons for termination, and she fails to make an argument that a reasonable jury could find them mere pretext. The combination of cash shortages and overpayments to herself and other employees raises substantial cause for concern. That is true in any business, but particularly so with a non-profit, which is accountable both to donors and the Commonwealth of Pennsylvania.[6]  Bernardo alluded to these fiduciary duties when she discussed the decision to approve Plaintiff's firing.  *See* Bernardo Dep. 38:5-38:18.  It bears mention that when Plaintiff described feeling overwhelmed by spreadsheets and money-counting, DeGori responded with encouragement despite the fact that spreadsheets and money-counting comprised much of Plaintiff's job.  Indeed, DeGori implemented a new petty cash counting system to help Plaintiff do her job.

---

[6] The Commonwealth maintains a Board of Corporations and Charitable Organizations. *See generally* PA. DEPT. OF STATE, *Information for Charitable Organizations* (last visited Mar. 18, 2026), https://www.pa.gov/agencies/dos/programs/charities/information-for-charities/-charitable-organizations (Overviewing how Pennsylvania's Department of State regulates charities' practices and financials and enforces laws related to charities' operations).

On this point, it is worth clarifying that firing a worker for legitimate performance-related reasons that are aggravated by their disability is not the same as firing them *because of* their disability. *See Westfall v. The Vanguard Grp.*, No. 06-4320, 2007 WL 1683849, at *3 (E.D. Pa. June 8, 2007) ("The ADA and the applicable case law state employers are not required to alter job performance requirements for disabled workers."). *See also Mole v. Buckhorn Rubber Prods.*, 165 F.3d 1212, 1219 n.3 (8th Cir. 1999), *cert. denied*, 528 U.S. 821 (1999) ("Firing an employee because of the job performance consequences of a disability . . . rather than the disability itself, is not actionable under the ADA.").

Plaintiff argues that the cash discrepancies and other errors were never definitively tied to her. Separately, she suggests that DeGori fired her to cover for Degori's own failure to review the payrolls. *See* Pl.'s Resp. at 10. But these disputes do not create a *material* issue of fact because an employee "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, F.3d 759 at 765.

In an effort to show pretext based on disparate treatment, Plaintiff points to a mistake made by a development team member after she left, a typographical error in a promotional mailer requiring a remailing at a cost to Variety of less than $200, where the involved employee was counseled but not fired. *See* Bernardo Dep. 56:13-58:21. The comparison Plaintiff seeks to draw is inapt, because the persistent financial mismanagement that led to her termination is conduct of an entirely different order of magnitude, and she too was provided with counseling and support when her difficulties with spreadsheets were revealed.

Finally, Plaintiff points to the recommendation DeGori provided to assist her with finding a job as evidence that her firing was pretextual. Given the importance of Plaintiff's role, and the

serious implications of the issues Variety identified, this evidence would not suffice for a reasonable jury to disbelieve the reasons Variety advances for her termination. The recommendation form in the record makes clear that Plaintiff was applying for a position working directly with children at Devereux, a behavioral health provider, unrelated to financial management. DeGori emphasized Plaintiff's volunteer work with Variety, and how its clients responded to her; it did not vouch for her as a bookkeeper or financial manager. Any inconsistency is minimal, and thus insufficient to rebut Variety's justification for its decision.

**B.    The record does not support a claim that Plaintiff was fired for engaging in protected activity.**

Next, Plaintiff claims she was fired in retaliation for the "protected activity" of requesting reasonable accommodations. *See* Pl.'s Resp. at 10-12.

Under the ADA and PHRA, a *prima facie* case of retaliation requires a plaintiff to show "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Canada v. Samuel Grossi & Sons*, 49 F.4th 340, 346 (3d Cir. 2022) (internal quotations omitted).

Getting fired is by its very nature an adverse action. *See* 42 U.S.C. § 12112(a). But Plaintiff points to no direct evidence linking any request for accommodation to her termination. In the absence of direct proof, "unusually suggestive" temporal proximity between an employee engaging in a protected activity and termination can suffice to establish causation. *See Shellenberger*, 318 F.3d at 189. Here, her requests for days off do not qualify as protected activity under the ADA because Variety had no notice that those requests were related to her disabilities. And although Plaintiff's brief boldly asserts a "pattern of antagonism," Pl.'s Resp. at 11-12,

Plaintiff received all the time she requested and suffered no criticism before or afterwards. That leaves her request to wear earbuds seven months earlier as the only possible protected activity. But even if one construes that as a request for accommodation, it is too remote in time to support an inference of causation. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (finding gap longer than two months not probative in the absence of other evidence).

In sum, the retaliation claims suffer from the same lack of evidentiary support as the discrimination claims.

## IV.     Conclusion

For the reasons above, Defendant's Motion for Summary Judgment will be granted.  An appropriate order follows.

  /s/ Gerald Austin McHugh
United States District Judge
